In the Matter of FRANK LA FORGE, JR., Petitioner, against STEPHEN P. KENNEDY, as Police Commissioner of the City of New York, Respondent.

In the Matter of JOHN P. IX, Petitioner, against STEPHEN P. KENNEDY, as Police Commissioner of the City of New York, Respondent.

First Department, May 28, 1959.

*James H. Tully* of counsel (*John T. Redmond* with him on the brief; *Wood, Werner, France & Tully,* attorneys), for petitioners.

*Robert L. Ellis* of counsel (*Seymour B. Quel* with him on the brief; *Charles H. Tenney, Corporation Counsel*), for respondent.

BREITEL, J. P. Arising from an alleged incident on October 13, 1954, two police officers, with excellent records in the department, were dismissed from the force, on the testimony of two civilians with police records. The nub of the charges was that the two officers, while on radio patrol, arrested the two civilians, Luis Pagan and Rafael Castejon, accused them of possession of contraband narcotics, and then proceeded to exact from them some $24 and an old watch, to secure their release. The charges were denied by the officers, and, following their dismissial, these proceedings under article 78 of the Civil Practice Act were brought September 1, 1955 to review the determinations dismissing them. The record does not indicate why this review by the courts has been delayed since 1955. Nor does it appear whether the police officers sought a reconsideration of the determinations from the Police Commissioner (Administrative Code of City of New York, § 434a–22.0) although there had been a change of Commissioner in the interim.*

Concurrently with this case, this court is deciding *Matter of Phinn* v. *Kross* (8 A D 2d 132), also a proceeding under article 78, in which the disciplinary dismissal of a correction officer has been reviewed and the determination annulled. The applicable rule has been clearly expressed in the opinion of Mr. Justice VALENTE in the *Phinn* case. As a consequence, repetition is not required; and the analysis in that case is accepted as the premise for this. Under the rule the determinations of the Police Commissioner dismissing the two police officers should be confirmed. This is required by the substantial evidence rule applied in the judicial review of disputed questions of fact, arising in administrative proceedings, under section 1296 of the Civil Practice Act. The rule prescribes that the evidence available to the fact-finder must be sufficient, as distinguished from a mere "scintilla", to account for the conclusions reached, but precludes the court from determining whether it would have pursued the same reasoning, that is, drawn the same inferences.

It should be readily apparent, especially if comparison is made with the *Phinn* case, that the application of this rule requires a somewhat detailed analysis of the facts. In both cases the civil servants under charges were members of uniformed, disciplined, quasi-military organizations. In both cases the witness or witnesses against the civil servants merit the closest scrutiny in ascertaining whether the accusations are entitled to any credit.

* Petitioners were dismissed on May 16, 1955. Commissioner Adams resigned August 2, 1955. On that same day Commissioner Kennedy was appointed, nine months short of a year in which application may be made for reconsideration.

For if the testimony is entitled to any credit the court's function of review ceases.

Luis Pagan and Rafael Castejon live on the West Side of Manhattan in the precinct to which the two police officers in this case were attached. Both had had a number of contacts with the police in connection with thefts, possession of narcotics, and other charges. According to other police officers, whose testimony was offered by petitioners on the departmental hearing, they had bad reputations for veracity. They were, indeed, minor figures in the criminal underworld. Patrolman La Forge, by way of contrast, had been on the force some nine years and had received 19 citations, many of them for extraordinary bravery. Patrolman Ix had been on the force eight years and had received four citations. Both officers have been responsible for many arrests. Neither had any blemish on his departmental record.

According to Pagan and Castejon, on the evening of October 13, 1954, some time between 8 and 9 o'clock, they met on the street outside a delicatessen on Columbus Avenue, near 89th Street. This was a short distance outside the sector to which the police officers had been assigned on radio patrol. Pagan and Castejon claimed that the officers arrested them, pretended to find a package near the radio patrol car, accused first one and then the other of the two civilians of having dropped the package, and then said that they were taking them in for possession of marijuana cigarettes. The civilians were placed in the rear of the automobile where they were required to kneel, because the rear was occupied by radio equipment. They were then driven to a point near and in view of the precinct station on 100th Street. In the course of conversations while they were still in the automobile, according to the civilians, there were threats of a beating up of the civilians at the police station and similar menaces with regard to prosecution. Then the officers asked first one and then the other of the civilians for money for their release. They asked for $100; but after the officers were told that neither had such sum, Patrolman La Forge accepted $24, of which Pagan supplied $20 and Castejon an additional $4.* Castejon also gave an old watch to Patrolman La Forge, which Castejon pointed out was no good. The patrolman said, however, that he would see them around and get more money from them. Thereupon the men were released. This was sometime between 9:30 and 10.00 P.M., the time being stated variously by the two civilians, when they first complained to the Police Department and when they testified at the departmental hearing.

---

* The fact is that Pagan had $50 on him, or, at least, he so advised the First Deputy Police Commissioner.

According to Pagan and Castejon, shortly after they were released, Pagan telephoned the office of the Federal Bureau of Investigation in New York City to complain of what had happened. He was told to complain to the First Deputy Police Commissioner of the city department. The next morning he made such complaint, Pagan giving the shield number of Patrolman La Forge, which he had recalled or noted. The police officers were brought in, confronted by the civilians, and questioned. Statements, later transcribed, were taken from all. Pagan positively identified the two policemen and confirmed his earlier recollection of the shield number of Patrolman La Forge, as shield number 10726. Castejon identified Patrolman La Forge but was less certain of Patrolman Ix. Both patrolmen unqualifiedly denied the occurrence of the incident, denied knowing the civilians, and denied knowledge of any similar or comparable incident. They also claimed that they had never left the assigned sector of the radio patrol during the previous evening.

While the appearance and complaints made by the civilians were completely recorded at police headquarters, their alleged telephone call to the Federal Bureau of Investigation lacks any confirmation. That office has no record of such a telephone call.

Between November 26, 1954 and December 10 of that year departmental hearings were conducted on charges placed against the police officers. Adjournments in the hearings were required by the difficulty in obtaining the presence of Castejon for whom an order to compel his appearance was eventually issued out of the Supreme Court.

The charges against the patrolmen were that they unlawfully released persons from police custody after arrest; that they had failed to report such arrests in the precinct station; that they had solicited money from the civilians; that they had taken money and property from the civilians; and that Patrolman La Forge had failed to report to his superior their absence from the assigned sector for radio patrol These charges were sustained following the hearing by the Hearing Commissioner, Deputy Police Commissioner Vincent L. Broderick, and confirmed by the then Police Commissioner, F. W. H. Adams. The patrolmen were thereupon dismissed from the police force.

On the departmental hearing, except as noted later, Pagan gave substantially the same testimony as he had the day after the incident before the First Deputy Police Commissioner. In addition, however, he added that, within a half hour after the incident, he had recorded the shield number of Patrolman La Forge on a fragment of a paper pie plate. He stated that

he had not made mention of this before, or previously produced the fragment, because he recalled the shield number and because he could not then find the paper fragment. On the departmental hearing, at an adjourned session, however, the paper fragment was produced and identified. It not only contained a record of the shield number of Patrolman La Forge but there was also noted on it the time of the occurrence as being between 10:15 and 10:30 P.M. Castejon, whose presence had been obtained with some difficulty, testified substantially to the same effect as had Pagan, except as noted later, but his identification of the police officers was quite dubious. He denied that he had ever picked the police officers out of a group, which, of course, was true, the police officers never having been placed in any kind of line-up. He sustained his identification of Patrolman La Forge by saying that Pagan had told him that La Forge was the officer driving the car and who had taken the money. He said that La Forge had always looked like the one that arrested him that night, but that he was never sure about Ix. The police officers testified and again denied any transaction with these two civilians or any similar incident and denied knowing them. A number of police officers, as observed before, were produced as witnesses by the patrolmen and they testified that Pagan and Castejon were well known to the precinct; that they had been suspects in many different criminal matters; that their reputation for veracity was bad; and they, the witnesses, would not believe what Pagan and Castejon said. It is of interest that Castejon's watch was never found.

At the hearing before the Deputy Commissioner, Pagan stated that Castejon had given the money to Ix. Later in the preliminary hearing he identified La Forge as the officer to whom Castejon paid the money. On the departmental hearing Pagan testified that Castejon had given the money to La Forge at a point across the street from where the patrol car was parked. Conversely, Castejon informed the First Deputy Police Commissioner that he had handed the money to La Forge, rather than to Ix. On the departmental hearing he testified that he had given the money to La Forge's partner while the latter was sitting in the patrol car. He denied making an earlier identification of La Forge as the officer to whom money was paid.

There were other variations between the testimony of Castejon and Pagan and some further variations between their testimony at the departmental hearings, other than those already mentioned, with the statements they had given the day after the alleged incident. These variations, however, are hardly greater than the variations usually found among persons who

testify to their recollection of past events, and particularly of events with emotional involvement.

As already twice observed, Castejon had become a reluctant witness when this matter came up for departmental hearing. The hearings were adjourned in order to obtain a court order to compel his appearance. He then proceeded to maneuver evasively when questioned with regard to the police officers. Thus, it does not suffice to excise particular portions of his testimony where his evasion was boldest, but his entire testimony must be read as a whole. Quite significantly, he confirmed that Pagan had told him, on the night of the alleged incident, that Pagan had then obtained the shield number of one of the police officers. He also confirmed his earlier statements the day after the incident, after vainly trying to avoid implicating the officers at all. The record demonstrates that the Trial Commissioner was aware of these evasive maneuvers because he pressed Castejon repeatedly with respect to those answers which were given most reluctantly or evasively.

With regard to the obvious anti-police bias of Castejon and Pagan, the fact is that Castejon, whose testimony was less inculpating, was the one of the two who was in present difficulties with the authorities. Moreover, the difficulties of both with the police, particularly of the 24th Precinct, explains as much the hesitancy of the one as it explains the aggressiveness of the other in testifying against these policemen. Especially in the light of the fact that a substantial number of officers from the 24th Precinct denounced these witnesses, it calls for careful analysis of the testimony of persons of humble or vulnerable status who had previously made charges against members of this uniformed force with a high *esprit de corps*. The consciousness of that need for caution is demonstrated throughout the record by the probing questions of the Trial Commissioner, even with regard to the pie-plate fragment.

The foregoing, then, in substance, is the record upon which petitioners were dismissed. If it contained no more than the say-so of disreputable witnesses with police records pointing the finger at upstanding police officers, this case might be no different than that of *Matter of Phinn* v. *Kross* (*supra*) in which this Court is annulling the determination of dismissal. But the situation is otherwise here.

In this case there are two men, each of whom corroborates, substantially, the testimony of the other. The two officers were on radio patrol that night, and the situs of the arrest was but a few blocks from the perimeter of their assigned sector. There is not the slightest suggestion provided of any sinister motiva-

tion to explain the accusations against the police officers. Even if the alleged telephone call to the Federal Bureau is ignored, there is the fact of prompt complaint the very next morning to the office of the First Deputy Police Commissioner. There is the recording of their complaints in detail less than 24 hours after the occurrence. There is the reporting of the shield number of Patrolman La Forge by Pagan even before the police officers had been brought to Headquarters for the identification. There is the prompt identification, in varying degrees, of the two police officers involved. There is, for whatever it is worth (and that worth is a matter for the determination of the Police Commissioner) the production of the paper fragment on which the shield number of Patrolman La Forge was recorded.

Thus viewed, there is much more than the say-so of one who was a convict, a narcotics addict and a stool-pigeon, as in the *Phinn* case, to identify and inculpate the civil servants. In the *Phinn* case, the convict never disclosed to Detective McInerney who it was that was trafficking in narcotics and letters in the City Prison, and there was a long delay before the convict claimed to have effected any transaction with the correction officer. Moreover, when the Correction Department personnel endeavored to obtain confirmation of the transaction their efforts resulted in total failure. All that remained was the finger-pointing by the convict. And nothing in his conduct, or in the nature of the transaction, or in any of the background circumstances, made it any more or less likely that Phinn was the culprit rather than any other man on the correction force. There was only the convict's word that Phinn was the culprit, and, if he had named any other correction officer in the prison, the proof would have been exactly the same. In that context, the naked word of a discreditable character — discreditable by objective standards — was entitled to no credit.

But, as has been seen, the record here supplied internal confirmatory facts, not unlike those, in principle, found in *Matter of Evans* v. *Monaghan* (306 N. Y. 312, 319–322). These, in addition to the testimony of Pagan and Castejon created an issue of fact because it created an issue of credibility. For a court then to substitute its evaluation for that of the administrator's is not permitted. And even in the situation where the courts exercise a broader scope of review, as in the case of a civil jury trial, it would hesitate to do so in the absence of having heard and seen the witnesses.

It is troublesome, of course, and there is some natural reluctance to accept the conclusion that two policemen with good records have indulged in so degraded a form of extortion. The

pettiness of the amounts received by the officers is quite incongruous, although there is the suggestion that further sums might be taken and that Castejon's watch was being held as some sort of security. The reluctance becomes the greater when the proof largely depends upon the testimony of persons like Pagan and Castejon. But all of this must have been evident to the experienced Trial Commissioner who heard the proof. And it also must have been evident to the then Police Commissioner, an experienced lawyer of standing in his own right, who reviewed the findings. While these additional circumstances may not be legally material, because, in any event, the scope of review by the court is so narrow, nevertheless they provide assurance for the conclusion this court must reach.

Petitioners rely on a number of cases in which the judicial review of administrative determinations under section 1296, particularly subdivisions 6 and 7 of the Civil Practice Act, has been held to be broad, almost as broad as the review which courts exercise in civil jury cases (e.g., *People ex rel. Gilson* v. *Gibbons*, 231 N. Y. 171; *Matter of Mitchell* v. *Mulrooney*, 242 App. Div. 48; *Matter of Reger* v. *Mulrooney*, 241 App. Div. 38, appeal dismissed 266 N. Y. 412). Those are cases of another period, when the doctrine of judicial review of disputed questions of fact in the administrative field had not yet been fully developed, and the statute was being literally applied. Even as long ago as in *People ex rel. Guiney* v. *Valentine* (274 N. Y. 331) it was quite evident that the rule was no longer as expressed in those cases, although they have never been expressly overruled. Indeed, in *Matter of Weber* v. *Town of Cheektowaga* (284 N. Y. 377) the Court of Appeals made it very clear that the rule in the *Gilson* case, if it were inconsistent with the more recent holdings of the *Guiney* case and of *Matter of Roge* v. *Valentine* (280 N. Y. 268), was not to be followed. (See, also, the analysis of the development of judicial review in 1 Benjamin, Administrative Adjudication, pp. 328–344.) Of course, there is little room left for controversy as to the scope of review in this particular area in the light of the even more recent decisions by the Court of Appeals. These are analyzed in detail by Mr. Justice VALENTE in Matter of *Phinn* v. *Kross* (*supra*) to which reference has been made.

Although it should hardly be necessary, it is good to recall, as did the Court of Appeals in the *Guiney* case (*supra*) the words of the Appellate Division for the Second Department, as far back as in 1905, in *People ex rel. Brown* v. *Greene* (106 App. Div. 230, 232, affd. 184 N. Y. 565) that: " The holding of the appellate courts of this State has uniformly been that the

good of the service requires that a wide discretion should be vested in police commissioners, and that their judgment and determination in a given case will not be disturbed unless there is an absence of evidence to sustain it. They being the statutory judges of offenses against the discipline and efficiency of the police force under their jurisdiction, their findings and determinations on the facts, when the evidence is conflicting and contradictory, should be regarded as conclusive, when there is, as in this case, sufficient evidence, if believed, to sustain their determinations ''. In applying this rule the test is not what the court believes, or what it thinks it would believe if it had seen and heard the witnesses, but whether the Police Commissioner or his Trial Commissioner could have reasonably believed the evidence supplied. (*People ex rel. Guiney* v. *Valentine, supra,* p. 335.)

Accordingly, the determinations of the Police Commissioner should be confirmed and the proceedings dismissed, with costs.

McNally, J. (dissenting): These article 78 proceedings were commenced by the petitioners to review the action of respondent's predecessor as Police Commissioner of the City of New York in dismissing them from their positions after a hearing. The proceedings were transferred to this court for review.

On the evening of October 13, 1954 the petitioner La Forge was serving as the operator of a Police Department radio car in the 24th Precinct in the Borough of Manhattan, City of New York, working the 4:00 P.M. to midnight tour. His partner was the petitioner Ix. That night their area of patrol extended north-south from 110th Street to 98th Street, and east-west from Central Park West to Riverside Drive.

Both officers at the time had outstanding records. La Forge was the possessor of a record of performance in the Police Department which would be difficult to equal. He had been a member of the department for almost nine years. During that time he made 150 arrests and was cited by the department for acts of valor and extraordinary achievement on 19 occasions. He was the recipient of the P. B. A. medal for valor, 11 commendations, six meritorious police duty awards, an award for excellent police duty and one honorable mention award. Typical of his devotion to duty are the circumstances set forth in the citation awarding him the P. B. A. medal for valor. It reads as follows: '' Entered apartment house where three people had been shot, pursued gunman along the roof of premises where he fired a shot at the officer who returned the fire. The thug threw his revolver at the officer who held further fire, and after a fierce struggle with the man, he was subdued and arrested.''

Ix also had a very creditable record. He had been a member of the department for eight years. On four separate occasions he was cited by the Police Commissioner for outstanding police work, holding three commendations and a meritorious police award. Indicative of his dedication to duty is the following excerpt from his official record: "Commendation. Located and arrested a man who had shot and wounded another, the gunman attempted to shoot the officers, but was quickly subdued and disarmed."

Neither La Forge nor Ix had any prior blemish on his departmental record.

These petitioners were accused of (1) unlawfully releasing prisoners from custody; (2) failing to report the arrest of said prisoners; (3) soliciting a sum of money from prisoners in lieu of arrest; (4) accepting a sum of money and a watch from one of their prisoners in lieu of arrest; and (5) failing to notify superior officers of their absence from their assigned sector, neglecting to obtain permission for such absence, and neglecting to make note of such absence in their memorandum books.

The complaining witnesses were Luis Pagan and Rafael Castejon. Their testimony is that they were stopped at the corner of 89th Street and Columbus Avenue, a point outside petitioners' patrol sector, and were accused by the petitioners of throwing "something" on the sidewalk, later alleged to be narcotics. The petitioners then placed them in the rear of the patrol car and took them to 100th Street, within a few doors from the 24th Precinct station house, and threatened them with arrest and beatings unless they were paid $100. They gave the petitioners $24 and a watch and were thereafter released.

The witness Pagan had been arrested a number of times on suspicion for various crimes and at the time of the hearing a charge of burglary which had been lodged against him had not been disposed of. There was evidence linking him to ambulance chasing, unethical undertakers, bail bondsmen, auto repairmen and tow truck companies. His reputation for veracity was not good. Pagan initiated and pressed the complaint against the petitioners. His clashes with the law no doubt resulted in unpleasant experiences with police attached to the 24th Precinct. In addition, Pagan testified he had heard that the officers at the said precinct "collect money from Puerto Ricans, they force them to give money." There is enough to indicate Pagan harbored resentment towards policemen and particularly those assigned to the 24th Precinct.

The witness Castejon at the time of the hearing was awaiting trial on a narcotics charge and had been previously found guilty of attempted grand larceny. His reputation was equally as bad.

Pagan variously fixed the time of the alleged events at three different times. When complaining to the First Deputy Police Commissioner the following morning, October 14, 1954, he stated the incident took place at 9:30 P.M. on October 13, 1954; at the hearing he first put the time as between 8:30 and 9:00 P.M., and later as between 10:15 and 10:30 P.M. The 8:30–9:00 P.M. time was completely discredited because documentary records proved that the petitioners were at 108th Street and Broadway from 8:30 to 8:50 P.M. This location was in their assigned sector. Castejon testified that the incident took place at a fourth time, that is, 10:00 P.M.

Evidence of the physical circumstances indicates that two men could not have been placed in the rear of the patrol car by reason of the presence of a crossbar and radio equipment.

Pagan claimed that he called the F. B. I. anonymously after the event but the F. B. I. records do not reveal the receipt of any anonymous call complaining of New York City policemen on the night in question.

The arrest was made in a congested, busy area with a crowd nearby, in the vicinity of Pagan's home. Yet no other witnesses were produced and reference was made by Pagan to only one, who was not called.

Highly incredible is the testimony that the petitioners went to the very shadow of their precinct house to " shake them down " and, moreover, did so openly on the street and not in the car. Pagan testified demands for money were made by petitioners as the police car proceeded to the 24th Precinct. Why, under the circumstances, one of the petitioners proceeded with Castejon to the southerly side of 100th Street, on which side was located the precinct house, to arrange for the payment, allegedly observed by Pagan, does not appear. Moreover, since Pagan's testimony was that he was searched by La Forge at the time of the arrest and his pay envelope containing $48 to $50 found, the record does not explain why Castejon, who also had been searched and had only $4 in his possession, was called aside to respond to an alleged demand for $100.

In a disciplinary proceeding, we have held that although the offense is established its commission by the accused is not established by substantial evidence when it appears solely from the unsupported testimony of a disreputable and discredited informer, and the record otherwise contradicts his testimony. (*Matter of Phinn* v. *Kross,* 8 A D 2d 132.) We are in agreement as to the yardstick by which the record is to be tested. If it rests on nothing more than the testimony of Pagan and Castejon, then this case is no different from *Matter of Phinn*

v. *Kross* (*supra*), and the determination should be annulled. Indeed, *Matter of Evans* v. *Monaghan* (306 N. Y. 312, 319–320) precludes any other view. (See, also, *Matter of Di Nardo* v. *Monaghan,* 282 App. Div. 5.)

In the final analysis, the identification of the petitioners rests on the credibility of Pagan. The incident occurred during the night of October 13, 1954. Castejon made the alleged payment. It was he who had the best opportunity to see and observe the petitioners. Nevertheless, the following day Castejon was unable to identify the petitioner Ix. Moreover, although on that day he identified petitioner La Forge as the one to whom the payment was made, Castejon contemporaneously nullified the identification by stating that he gave the money to the recorder, who was petitioner Ix, and not to the operator of the radio car, who was petitioner La Forge. Castejon's following testimony at the hearing clearly establishes that his identification of La Forge on October 14, 1954 was prompted by Pagan, who had previously seen the said petitioner on said day:

" Q. Do you remember you were asked questions down in Deputy Commissioner Kennedy's office? A. Yes, sir.

\* \* \*

" Q. Do you remember how many officers were sitting in that room when you came in, how many policemen in uniform? A. Well, when I seen them on the bench, there was two cops standing there.

" Q. What did they ask you — did they say, 'Are these the men?' A. Yes, I look in the back and I identify one. I say one was driving the car.

" Q. How could you say that was the man that was driving the car? A. Well, *because when I — the other fellow Pagan went in — when he come out, he told me he was the officer.*

" Q. What did he say to you? A. He said, ' There they are, those two cops.'

" Q. He said, ' There they are '? A. Yes.

" Q. Lots of police officers look alike? A. Please?

" Q. I said policemen wearing a uniform have a tendency to look alike? A. I said — you see, I can't say they are sure because after they got the uniform — after that day I went up to my house a couple of days later. *I see other cops that look more than the one that arrest us that night. I can't say he is the one.*

" Q. Do you see these two men sitting there now? Do you say those are the men that stopped you that night? A. I can't say that.'' (Emphasis supplied.)

Pagan's identification of the petitioners is completely unreliable. On the morning following the incident, he informed the First Deputy Commissioner that two patrolmen assigned to a radio car of the 24th Precinct were involved and that one of them had badge No. 10726. Unfortunately, neither Pagan nor Castejon were required to identify the accused out of a group or a line-up.

Pagan, on October 14, 1954, described the payment as follows:

" Q. Did you see him hand the money to him? A. Not to the driver, to the other one.

\* \* \*

" Q. And, he gave it to the man on the right hand side, not the driver? A. Yes."

(At the hearing Pagan testified the money was passed to the operator of the radio car, petitioner La Forge.)

Pagan thereafter was confronted with the petitioner La Forge and interrogated as follows:

" Q. What shield number did you refer to this morning when you came here to make your complaint? A. #10726.

" Q. Would you know the officer if you saw him? A. Yes.

" Q. Is this the officer that stopped you in the radio car last night about 9:30 P.M. and whom you allege your friend gave the sum of $24 and a watch after threatening to arrest you on a false charge? A. Yes."

Petitioner Ix was interrogated on October 14, 1954 in the presence of Pagan as follows:

" Will you have Patrolman Ix step in here and bring Louis Pagan in?

" Interrogating Ptl. Ix.

" Q. Who was your partner last night? A. Patrolman Frank La Forge, Jr.

" Q. In the radio car? A. Yes, sir.

\* \* \*

" Louis Pagan recalled:

" Q. Is this the second patrolman you saw last night (Pointing to Ptl. Ix)? A. Yes, sir."

Prior to being confronted with the petitioners, Pagan stated to the First Deputy Commissioner that the money had been paid to the recorder (Ix) and not to the operator (La Forge). Pagan's identification of the petitioners on October 14, 1954, under the stated circumstances, is suspect when he was unable the morning after the occurrence to identify the payee and the operator of the radio car as the same person. It is to be noted that Castejon consistently, before the First Deputy Commissioner and at the hearing, asserted the payment was made to

the recorder and not the operator. If that be so, and petitioner Ix was not the one to whom payment was made, then it follows that La Forge was not the operator of the alleged radio patrol car involved.

The record establishes that Pagan harbored a deep rooted grievance towards officers attached to the 24th Precinct. If, as claimed, he had been victimized, it is doubtful that one such as Pagan would have any scruples or exercise discrimination and restraint in venting his spleen on any one identified with the said precinct.

Patrol cars are numbered and bear registration numbers which offer a more obvious and available method of identification than a badge number. For no apparent reason the attempt at identification was concentrated on petitioner La Forge whose record indicates extensive and successful activities in curbing crimes of violence. Viewed in the light of the surrounding circumstances, the attempt at bolstering the tenuous identification in the manner to be described is highly significant.

Pagan was recalled after the petitioners and their witnesses had testified, and testified that on the night of October 13, 1954, about one-half hour after the incident complained of, he returned to his home and in the presence of his wife noted the shield number, the time and the place of arrest on a small white cardboard pie plate. (The white cardboard pie plate was treated with as if it was in evidence and Pagan was questioned closely concerning it although it was marked for identification only.) The time noted on the exhibit was 10:15 to 10:30. Pagan then also testified that the arrest was witnessed by one Ernest Serrano. Neither Serrano nor Pagan's wife testified. Pagan did not mention or use the said exhibit or name the said witness during his statement to the First Deputy Commissioner on the day following the incident.

In the search for the substantial evidence required to support the instant determinations, the prior consistent statement of Pagan must be put aside and only the residual competent evidence given effect. (*Crawford* v. *Nilan*, 289 N. Y. 444; *Matter of Carroll* v. *Knickerbocker Ice Co.*, 218 N. Y. 435, 440; *Matter of Reynolds* v. *Triborough Bridge & Tunnel Auth.*, 276 App. Div. 388, 390.)

There is little to choose between evidence colored by the motive of personal gain of an informer as in *Matter of Phinn* (*supra*) and the distorted and highly emotional recollection of Pagan. Evidence from such a source does not rise to the requirement of substantial evidence in matters such as here involved.

The evidence in support of an administrative determination, in the light of the record as a whole, must satisfy a reasonable mind. (*Matter of Kopec* v. *Buffalo Brake Beam-Acme Steel & Malleable Iron Works*, 304 N. Y. 65, 71; *Matter of Phinn* v. *Kross*, 8 A D 2d 132, *supra*.) Unlike *Matter of Evans* v. *Monaghan* (306 N. Y. 312, *supra*), this record does not contain evidence of circumstances which lend credence to the identification made by Pagan. Contrariwise, the judicial conscience is disturbed by the anomalies and disparities here present.

The test enunciated in *Matter of Stork Restaurant* v. *Boland* (282 N. Y. 256, 273) by the Court of Appeals has been generally applied in proceedings such as this. In the *Stork* case, Chief Judge LEHMAN said: "A finding is supported by the evidence only when the evidence is so substantial that from it an inference of the existence of the fact found may be drawn reasonably." Appropriate also are the words of Mr. Justice FRANKFURTER in *Universal Camera Corp.* v. *Labor Bd.* (340 U. S. 474, 488): "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

Petitioners emphatically denied the charges and denied knowledge of the complaints on or prior to October 13, 1954. The site of the alleged arrest was outside the area to which petitioners were assigned on October 13, 1954, and it was a violation of Police Department rules to depart from the assigned sector. Petitioners denied having been out of their patrol area during their hours of duty, which included the various times adverted to by the complainants. Petitioners made every scheduled ring to their headquarters at 30-minute intervals. Between 8:37 and 8:47 P.M. on the night in question, one of the periods alleged by Pagan as the time of the arrest, petitioners responded to a call at 108th Street between Broadway and Amsterdam Avenue, some distance removed from the site of the arrest at 89th Street and Columbus Avenue. Petitioners' official records are exemplary and nothing therein suggests the vile character traits implicit in the charges leveled against them.

We are of the opinion that the determinations should be annulled and the petitioners reinstated.

RABIN and VALENTE, JJ., concur with BREITEL, J. P.; McNALLY, J., dissents in opinion in which M. M. FRANK, J., concurs.

Determinations confirmed and petitions dismissed, with $20 costs and disbursements to the respondent.